IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENLO WORLDWIDE GOVERNMENT<br>SERVICES, LLC<br>2855 Campus Drive<br>San Mateo, CA  94403-2510<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE<br>1000 Defense Pentagon<br>Washington, DC  20301-1000<br><br>and<br><br>UNITED STATES TRANSPORTATION<br>          COMMAND<br>508 Scott Drive<br>Scott Air Force Base, IL  62225-5357<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR PERMANENT INJUNCTION
## AND DECLARATORY JUDGMENT ("REVERSE-FOIA")

Plaintiff Menlo Worldwide Government Services, LLC ("Menlo") states the following

for its complaint against Defendants United States Department of Defense ("DOD") and United

States Transportation Command ("USTRANSCOM"):

### NATURE OF THE ACTION

1.    This is a "Reverse FOIA" action arising from USTRANSCOM's November 17,

2010 decision to release a copy of Menlo's successful proposal for USTRANSCOM's Defense

Transportation Coordination Initiative ("DTCI") in response to a request under the Freedom of

Information Act ("FOIA").   Menlo's proposal was submitted under a Government-prescribed

restrictive legend that limited its disclosure to Government use only.  Because Menlo's proposal

contains confidential commercial or financial information that is exempt from public release, the

agency's decision to release an essentially unredacted copy of Menlo's DTCI proposal is

arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

      2.        Menlo seeks a judicial declaration that the DTCI proposal falls within the scope

of FOIA Exemption 4 and that the Trade Secrets Act prohibits USTRANSCOM from publicly

releasing an unredacted copy of Menlo's DTCI proposal.  Menlo also requests the Court to

permanently enjoin USTRANSCOM and DOD from releasing the DTCI proposal.

      3.        Menlo is not seeking a preliminary injunction at this time because

USTRANSCOM has represented that it will withhold the information addressed in the subject

FOIA request upon receiving notice that this action has been filed.

## PARTIES

      4.        Plaintiff Menlo Worldwide Government Services, LLC ("Menlo") is a limited

liability company organized under the laws of the State of Delaware with its principal place of

business in San Mateo, California.

      5.        Defendant United States Department of Defense ("DOD") is a Department of the

Executive Branch of the United States Government.  DOD is responsible for and controls

USTRANSCOM.

      6.        Defendant United States Transportation Command ("USTRANSCOM") is an

agency of the Executive Branch of the United States.  USTRANSCOM is a subagency or

component of DOD with its headquarters at Scott Air Force Base, Illinois.  USTRANSCOM

received the FOIA request at issue in this litigation and announced its decision to release

information responsive to the FOIA request by letter dated November 17, 2010.

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331.  This action arises under the laws of the United States, including the Freedom of Information Act, 5 U.S.C. § 552, the Trade Secrets Act, 18 U.S.C. § 1905, the Administrative Procedure Act, 5 U.S.C. § 551-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## FACTS

9.     Menlo is the prime contractor for USTRANSCOM's Defense Transportation Coordination Initiative ("DTCI").  DTCI is a strategic logistics program designed to improve the reliability, predictability, and efficiency of DOD freight transportation in the continental United States through the increased use of dedicated truck schedules, cross-docking operations, better mode selection, and load optimization.  The program allows DOD to leverage Menlo's unique transportation management skills and its existing commercial freight volume to achieve high quality service, distribution efficiencies, and cost savings.

10.     Following a highly competitive procurement process involving Menlo and many other logistics management companies, USTRANSCOM awarded the DTCI Contract to Menlo in August 2007.

11.     The competitiveness of the program is further demonstrated by the submission of a bid protest to the Government Accountability Office (GAO) by Ryder Integrated Logistics, Inc. against USTRANSCOM's selection of Menlo.

12.     DTCI is a new and unprecedented DOD transportation logistics program.  The procurement process through which Menlo was awarded the DTCI Contract was the first

solicitation of its kind. Menlo was the first contractor to submit a successful proposal in response to the DTCI solicitation and was the first contractor selected to implement DTCI.

13.     The DTCI Contract awarded to Menlo has a three-year base period worth approximately $525 million. The DTCI Contract has two one-year option periods valued at approximately $543 million and two one-year option periods worth approximately $567 million. If all options are awarded, the total estimated value of the DTCI Contract exceeds $1.5 billion over seven years.

14.     The initial three-year base period in the DTCI Contract expired in October 2010. USTRANSCOM has exercised the first option, which extends the DTCI Contract through October 2011.

15.     USTRANSCOM has not advised Menlo as to whether it will exercise all of the options that could extend the DTCI Contract through October 2014 or conduct a new competitive procurement.

16.     The DTCI contract represents the first phase of a new method of obtaining transportation and logistics services. USTRANSCOM is contemplating the extension of the program to other types of freight and to new geographic areas. Such additional requirements would likely be acquired by USTRANSCOM through another competitive procurement similar to the competition for the DTCI Contract.

## THE FOIA REQUEST

17.     By letter dated July 16, 2010, USTRANSCOM advised Menlo that it had received a FOIA request from the Washington law firm of Baker & Hostetler LLP seeking a copy of the proposal that Menlo submitted in response to the DTCI solicitation.  The July 16 letter contemplated that Menlo's proposal would contain confidential commercial or financial information and thus invited Menlo to identify any portions of the proposal that would be exempt from public disclosure under FOIA.

18.     Menlo responded to USTRANSCOM by letter dated August 16, 2010.  Among other things, Menlo's August 16 letter explained that its entire proposal falls within the scope of FOIA Exemption 4:  "Disclosure of any part of our proposal would give a competitor insight into the organization, strategy, and breadth of Menlo's proposal and competitive decision-making in responding to the DTCI solicitation and similar solicitations. . . .  Public disclosure of Menlo's proposal would unfairly benefit Menlo's competitors and likely cause substantial competitive harm to Menlo."

19.     As set forth in Menlo's August 16 letter, the confidential commercial and financial information in its proposal includes the following:

        a)     the structure and content of Menlo's proposal;

        b)     innovations and competitive strategies Menlo would utilize in the performance of the contract;

        c)     strategies used to meet and exceed small business subcontracting goals;

    d)    the identity of Menlo's key personnel and subcontractors, including the identity of its reliable and capable small business subcontracting partners;

    e)    details concerning Menlo's efforts to find reliable small business subcontractors and Menlo's outreach efforts to identify qualified subcontractors qualified as small businesses, disadvantaged businesses, 8(a) participants, women-owned businesses, service disabled veteran owned small businesses and HUBZone contractors;

    f)    Menlo's approach to providing relevant past and present performance information to enhance its competitive position; and

    g)    detailed information regarding Menlo's pricing strategies and the development and presentation of documentation supporting Menlo's pricing proposal.

20.    Menlo's proposal also contained confidential and proprietary information submitted by its subcontractors and teaming partners, with whom Menlo has various confidentiality and non-disclosure agreements.

21.    Menlo explained that disclosure of its proposal would likely cause substantial competitive harm by assisting its competitors "in their development of competing proposals for the next phase of the DTCI contract and for future similar work."

22.    Menlo explained that confidential commercial and financial information "runs throughout the proposal" and that it is "essentially non-segregable" from material that could be

released to the public.  Because of the difficulty of segregating the portions of the proposal that could be released, Menlo asserted that its entire proposal is exempt from public disclosure.

23.    While Menlo believed that the entirety of its proposal should be exempt from disclosure under FOIA Exemption 4, Menlo also submitted a proposed redacted version of its proposal that could be released to the public.

## USTRANSCOM RELEASE DECISION

24.    In a letter dated November 17, 2010, USTRANSCOM notified Menlo that it intended to release Menlo's proposal in full, redacting out only the identities of Menlo's suppliers and employees.  The agency did not limit its intended release of information to the redacted version that Menlo had provided.

25.    USTRANSCOM's November 17 letter included a September 30, 2010 memorandum identifying the factors supporting its decision.  The September 30 memorandum demonstrates that USTRANSCOM's decision to release Menlo's DTCI proposal is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

26.    For example, the September 30 memorandum concludes that Menlo failed to show it would suffer substantial competitive harm from the release of its proposal because Menlo did not state the percentage of business it earned from its government contracts.  The DTCI contract is valued at approximately $1.5 billion over seven years.  That amount would be a substantial part of any company's business, no matter how large the company is or how much revenue it derives from government contracts.  Yet the September 30 memorandum theorizes that "Menlo's government contracting business may be a small percentage of its overall business, in which case the impact of this release will be less than if the company's business model relies solely on government sources of income.  A case for harm that rises to the 'substantial' level must

provide more detail about the nature of Menlo's business and why this particular proposal is so sensitive." Such utter nonsense in the memorandum providing the rationale for release of Menlo's proposal shows the arbitrary and capricious nature of the decision.

27.     Contrary to the September 30 memorandum, the percentage of a company's revenue from its government contracts plays no role in the determination of whether release of that company's proprietary information would cause it substantial competitive harm.

28.     The September 30 memorandum ignores the fact that the DTCI contract is worth approximately $1.5 billion over seven years. Allowing Menlo's competitors an unredacted copy of Menlo's successful proposal would cause substantial competitive harm to Menlo even if the DTCI contract were itself only a small portion of Menlo's annual revenues.

29.     The September 30 memorandum also fails to consider that the DTCI contract represents approximately 97 percent of the revenues of Menlo Worldwide Government Services, LLC. The agency's failure to request this information from Menlo, when the agency believed it was a relevant factor in determining whether release would cause substantial competitive harm, was another arbitrary and erroneous action.

30.     The September 30 memorandum erroneously concludes that Menlo's proposal cannot fall within the scope of FOIA Exemption 4 because it follows "state-of-the-art business practices in its structure and content" and because it uses "best practices." This determination is arbitrary and capricious because the DTCI procurement was the first of its kind. Prior to Menlo's proposal, there was no "state of the art business practice" for responding to this procurement because there had never been such a program or procurement before.

31.     Indeed, the agency's acknowledgement that Menlo's proposal demonstrates "state of the art business practice" and "best practices" supports Menlo's argument that release of its

proposal would Menlo cause substantial competitive harm.  By acknowledging that Menlo has developed a proposal that is "state of the art" and uses "best practices," the agency demonstrates the usefulness of Menlo's proposal as a road map for Menlo's competitors to follow in preparing their own future proposals for such services.

32.    The market for integrated logistics management services, which includes the real prospect of competition for follow-on DTCI contracts in the near future, is highly competitive. Allowing Menlo's competitors any information about the contents or structure of Menlo's "state of the art" DTCI proposal would deny Menlo the competitive advantage that it earned in developing the proposal.

33.    In addition, release of the unique means and methods identified in Menlo's proposal would cause substantial competitive harm to Menlo's corporate affiliates, which provide integrated logistics management services in the commercial marketplace.

34.    USTRANSCOM's decision also erroneously relied on the fact that a small portion of Menlo's proposal contains information that appears elsewhere in publicly-available materials. Obviously, Menlo does not seek to protect information it has publicly disclosed, and competitors already have access to such information.  The competitively-sensitive information here is Menlo's strategic determination of what particular small portions of its publicly available information should be included in its proposal and where and how it should be presented in the proposal.  Releasing such information in this context would provide an unfair competitive advantage to Menlo's competitors.

35.    USTRANSCOM notes that Menlo objected to the release of its table of contents and the number of pages devoted to individual elements of the proposal,  contending that this information, by its nature, could not be competitively sensitive.   This is tantamount to stating

that a secret recipe must be released because the ingredients are known. Providing competitors with strategic information concerning the formulation of Menlo's "state of the art" and "best practices" proposal would reveal competitively-sensitive information on how to prepare future proposals for this program.

36.     Further, the agency acted inconsistently with its own rationale because it did not limit its intended release of Menlo's proposal to only those portions containing publicly-available information. Justifying the intended release of Menlo's entire proposal based on the conclusion that the proposal contains some information that should be disclosed further demonstrates the arbitrary and irrational nature of the agency's decision.

37.     The September 30 memorandum dismisses the potential competitive harm that would come from revealing data reflecting Menlo's successful performance of earlier contracts on the theory that a competitor who copied such data verbatim would be identified as fraudulent. But no competitor would act so robitically. Instead, they would use Menlo's proposal as a guide and  adopt the methodology that Menlo created to identify their own relevant past performance data.  Menlo's competitors would gain an unfair competitive advantage from being able to draw from Menlo's successful proposal methodology and learn how best to present their own data and to compare it to Menlo's.

38.     The September 30 memorandum also erroneously concludes that pricing information in Menlo's proposal falls outside the scope of FOIA Exemption 4 because it was not "broken down into units that would reveal Menlo's own costs in providing the services in question." The September 30 memorandum misconstrues Menlo's proposal. The proposal includes substantial insight into the cost basis for Menlo's pricing, including not only the number of labor hours that will be devoted to the performance of specific tasks required by the DTCI

Contract, but also a breakdown of the costs that Menlo expects to incur each year in the performance of the DTCI Contract.

39.     The agency's argument as to Menlo's pricing proposal also conflicts directly with the recent decision in Canadian Commercial Corp. v. Air Force, 514 F.3d 37 (D.C. Cir. 2008), which affirmed an agency decision to withhold line-item prices under FOIA Exemption 4.  The court's finding of competitive harm in that case was based on the fact that the line item prices for three one-year options would allow competitors to make better decisions about whether to compete for work in the incumbent contract and to be more effective in persuading the government not to exercise the options.  This principle applies equally to the release of Menlo's pricing information.

40.     The September 30 memorandum's attempt to distinguish the result in General Electric Co. v. Air Force, 648 F. Supp. 2d 95 (D.C. Cir. 2009), is based on the irrational assumption that there is a material difference between the competitive harm that might result from the disclosure of pricing for airplane parts and the harm that might result from the disclosure of pricing for logistics services.  It is irrational for the agency to base its decision to release Menlo's DTCI proposal on such a baseless and flawed assumption.

41.     USTRANSCOM's November 17 letter advised Menlo that it would wait five federal business days from Menlo's receipt of the letter before releasing the information in order to provide Menlo with "an opportunity to take appropriate measures to take legal action before a release is made."

42.     Menlo advised USTRANSCOM on November 22, 2010 that it would be filing an action to prevent the release of its DTCI proposal.  In accordance with DOD policy,

USTRANSCOM has confirmed that it will continue withholding the DTCI proposal pending a court ruling in this matter.

## COUNT I - ADMINISTRATIVE PROCEDURE ACT

43.     Menlo realleges and incorporates by reference each allegation set forth in paragraphs 1 through 42 of this Complaint.

44.     USTRANSCOM'S decision to release Menlo's DTCI proposal is a final agency action in accordance with 5 U.S.C. § 704.

45.     Menlo's DTCI proposal falls within the scope of Exemption 4 of the Freedom of Information Act.  5 U.S.C. § 552(b)(4).

46.     Public disclosure of Menlo's DTCI proposal would violate the Trade Secrets Act. 18 U.S.C. § 1905.

47.     USTRANSCOM's decision to release Menlo's DTCI proposal is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

48.     Public disclosure of Menlo's DTCI proposal will cause irreparable harm to Menlo by allowing Menlo's competitors an unfair competitive advantage in competing for future government and commercial contracts similar to the DTCI.

49.     Menlo will have no adequate remedy at law if USTRANSCOM publicly discloses Menlo's DTCI proposal.

50.     The benefits of granting an injunction outweigh the harm that other parties will suffer if the injunction is not granted.

51.     Injunctive relief will serve the public interest in protecting confidential business information from inappropriate government disclosure.

**WHEREFORE**, Menlo respectfully requests that the Court enter an order:

A.   Declaring that the documents comprising the proposal submitted by Menlo in an effort to obtain the award of the DTCI Contract falls within the scope of FOIA Exemption 4 and the Trade Secrets Act;

B.   Declaring that the decision to release Menlo's DTCI proposal is arbitrary and capricious or otherwise contrary to law in violation of the Administrative Procedure Act;

C.   Permanently enjoining USTRANSCOM and DOD from publicly releasing the documents comprising Menlo's DTCI proposal; and

D.   Granting such other and further relief as the Court may deem just and proper.

**DATED** this 24th day of November 2010.

Respectfully Submitted,

Brian P. Waagner (DC Bar No. 450823)
David P. Hendel (DC Bar No. 370705)
Husch Blackwell
750 17th Street, NW, Suite 1000
Washington, DC  22182
Phone:  (202) 378-2300
brian.waagner@huschblackwell.com
david.hendel@huschblackwell.com